SALTER et al. v. GALVESTON, H. & S. A.
RY. CO. (No. 8857.)

(Court of Civil Appeals of Texas. Galveston.
April 23, 1926. Rehearing Denied
July 1, 1926.)

1. Negligence ☞122(I).

Contributory negligence will not be presumed from mere fact of accident or injury.

2. Negligence ☞82.

For defense of contributory negligence defendant must prove, not only negligence of plaintiff, but that it was proximate cause of injury.

3. Negligence ☞135.

Defense of contributory negligence is not made out where inference of due care is just as reasonable as that of absence thereof.

4. Railroads ☞348(8)—Evidence held insufficient to authorize finding of contributory negligence of girl killed by train colliding with automobile in which she was riding.

Evidence in action against railroad for death of one of three girls, all riding on front seat of automobile as guests of driver at time of crossing collision with train, *held* insufficient to sustain finding of her negligent failure to seasonably see train and warn driver, contributing to accident.

Appeal from District Court, Harris County; Roy F. Campbell, Judge.

Action by O. W. Salter and another against the Galveston, Harrisburg & San Antonio Railway Company. Judgment for defendant, and plaintiffs appeal. Reversed and remanded for new trial.

Fulbright, Crooker & Freeman, of Houston, for appellants.

Baker, Botts, Parker & Garwood and Garrison & Watson, all of Houston, for appellee.

GRAVES, J. Appellants, parents of a 16-year old daughter, Vivian Salter, sought damages for the alleged negligent causing of her death by the railway company in a collision between one of its passenger trains and an automobile, in which the girl was riding, at a public crossing on the railway near Sylvan Beach Station. Vivian Salter and two other young girls were at the time, as guests, taking a ride upon his invitation with Morris (nicknamed Buddy) Miller in his Chandler car, all four sitting upon the front seat, and all being killed outright in the accident.

The negligence charged against the railway company was in failing, (1) to keep a lookout for persons using and about to use the crossing; (2) to ring the bell and blow the whistle within such distance from the crossing as would warn an ordinarily prudent person using or about to use it; (3) to maintain the crossing in such a condition as not to unnec-

essarily impair the use thereof; (4) to keep a flagman there, or provide some other monitory device to warn people using or about to use it of the approach of trains; and (5) in operating the train at an excessive rate of speed.

In answering, the appellee railway company alleged that all four occupants of the automobile were guilty of contributory negligence in the failure of each and all of them to keep a proper lookout for the approaching train; that all four were sitting upon the front seat, and, as the car in which they were riding approached the train, it was running at the rate of 25 miles or more per hour, and they were laughing and talking, exercising no care whatever to discover the coming train.

Special issues embodying these averments of negligence on both sides went to the jury, all those made by appellants being answered against them, except that appellee failed to exercise ordinary care in the two respects of neither keeping a proper lookout nor in giving due warning by blowing the whistle—each dereliction proximately contributing to the accident—while that of the appellee was answered by a finding that the deceased girl was guilty of contributory negligence causing her death in failing to see the train "in time to have notified the driver, so that he could have stopped the automobile in time to have prevented the collision." On this verdict the court rendered judgment that appellants take nothing, and they appeal.

There was also a finding of the jury fixing the amount of damages appellants sustained, but since, in our opinion, the correctness of the judgment against them depends upon the sufficiency of the evidence to sustain the finding of such contributory negligence on the part of their deceased daughter, no further reference need be made to the case as made for them; it seems to have established in them a prima facie right to recover.

Proposition No. 1–B, as presented here by the appellants, is as follows:

"The burden of proof is upon the defendant to establish by a preponderance of the evidence its defense of contributory negligence, and where the evidence is equally consistent with the exercise of due care on the part of plaintiff as it is with contributory negligence, the defendant fails to discharge such burden of proof."

We think this contention should be sustained. The trial court had properly instructed the jury that the burden of proof was upon the appellee to establish "by a preponderance of the evidence" the defense of contributory negligence, which it had pleaded; that charge had also, and again properly, in view of the undisputed fact that Vivian Salter was only an invited guest for a ride in the automobile at the time, in submitting the matter to the jury, made this distinction:

(285 S.W.)

"You are instructed that in considering the question of whether or not Vivian Salter was guilty of contributory negligence you will not find her guilty of contributory negligence simply because you may believe (if you do believe) Morris Miller, the driver of the automobile in which Vivian Salter was traveling at the time of the collision, was guilty of such negligence, but you will determine the question of her contributory negligence, if any, by what she did, or did not do, under all the facts and circumstances surrounding the case."

The particular questions propounded, together with the answers returned, were these:

"Did the deceased, Vivian Salter, see or hear the approaching train as the automobile in which she was riding approached the crossing in time to have notified the driver, so that he could have stopped the automobile in time. to have prevented the collision?"

"She did not."

"Was such failure on her part to see the approaching train in such time negligence, as that term has heretofore been defined to you?"

"It was."

"Was such negligence a cause, or contributing cause, of her injury and death?"

"It was."

Just what supported these answers is a vain search in the statement of facts; there is such a paucity of proof upon the matter as to raise very serious question as to the existence of any evidence at all of contributory negligence upon this girl's part, but if there be any raising that issue, it clearly fails to constitute the required preponderance. No witness testified to seeing her or any one of the other three occupants of the car, as it approached the railroad crossing, look either away from or toward the train, or do or not do any other act indicating indifference to their own safety, nor did any one of the four live to directly tell the story of the tragedy. How then did the jury—bound as they were under the court's charge to gauge the quality of this young girl's acts solely by what she herself did or did not do—determine that she did not in fact see that train coming in time to have notified the young boy driver so that he could have stopped his automobile soon enough to avoid the collision? In this absence of anything to the contrary, how could they determine that she did not so see the train and notify the boy, and that he either failed to heed the warning in time or attempted to beat the train across? There being thus no testimony whatever touching the matter, the answer must be by conjecture, surmise, or inference alone. And the only basis for a conclusion so drawn, as appears to us, after a most careful examination of the statement of facts, is the single fact of the occurrence of the collision. In other words, the accident did happen at the time, place, and in the surroundings shown, and from that fact the jury concluded that this girl, out for a ride with her companions as invitees for that purpose of the young man driver, must have been negligent in not seeing the train in time to have, by her own action, caused it to be averted.

[1, 2] Under the well-settled authority, however, contributory negligence will not be presumed from the mere fact of accident or injury (Railway Co. v. Crump [Tex. Civ. App.] 212 S. W. 827), but the defendant must prove both that plaintiff was negligent and that such negligence was the proximate cause of the injury (Railway Co. v. Eaton [Tex. Civ. App.] 222 S. W. 318).

[3, 4] When the physical facts at the place of the accident, the speed of the two vehicles, and the known situation of those in the automobile are looked to, they fail, we think, as against the presumption that always prevails, in the absence of evidence to the contrary, that one is not negligent (S. W. Rep. Digest, vol. 16, p. 1371, par. 122), to furnish sufficient premises for such a conclusion. At most they seem to us to reflect a situation from which the inference that due care was exercised is just as reasonable as that it was not, and in such an instance the affirmative defense of contributory negligence is not made out. 29 Cyc. 622; Martin v. Louisville Gas & Electric Co., 198 Ky. 370, 248 S. W. 868; Houston Power Co. v. Barnes (Tex. Civ. App.) 152 S. W. 724; Railway Co. v. McGary's Adm'r, 104 Ky. 509, 47 S. W. 440. And this rule of evidence applies alike with equal force to the two separate elements of the defense, that is, the actual existence in the first instance of the remissness, and, in the second, of its being a proximate cause of the injury, as was held by the court in the Eaton Case, supra.

In material substance, these physical facts and surroundings were as follows:

When the automobile came within about 350 feet of the railroad crossing, the train was then about 800 or 900 feet away, and could have been seen by those in the automobile. if they were looking toward it, the view in that direction being unobstructed. The train was running probably 35 miles per hour, while the speed of the automobile was estimated at about 25 or 30 miles per hour, and appellants' counsel deduces that it was only 15 seconds, or a quarter of a minute, from the time the two machines reached these relative positions until the collision. The three girls were all in the front seat of the car with the driver, he being behind the steering wheel, but their individual positions otherwise were not given, except that one of them, which one not appearing, sat sidewise with the greater part of her body leaning towards the back of the car and possibly having one of her legs on the lap of one of the other girls. The car was a Chandler, in good mechanical condition, could have been stopped when going 25 or 30 miles an hour within about 10 or 15 feet, and the driver, Buddy Miller, was a careful, competent, and con-

servative driver. In addition, there is the testimony of the witness Handley, who admittedly had just raced across in front of this train, the material portions of which may be fairly collated as follows:

"I don't know what happened to these people in that car as they started across the track; after I saw the train hit the car, I knew they were hurt; the train hit them and drug them over here (demonstrating). * * * There was a car coming there, and I stopped here, to see what was wrong with my car, and got out, and that train hit this car by the rear door and the wheels. There was a boy driving the car. The train did not whistle any more; there was a crash, and then the whistle; it was not a distinct whistle; it looked like it was grabbed in a hurry. * * *

"Running at the rate of 35 miles per, that is, the train, I wheeled to the left and crossed in front of that train to the best of my judgment about 200 feet ahead of it. I tried to beat it across. I was not in a hurry; I was racing to see if I could beat the train across the track. I do not do that often since that time; I quit. * * * When I got the other side of the track I stopped in about 25 feet; I stopped between that sign 'Railroad Crossing' and the track. There is a large sign there that says 'Railroad Crossing.' I did not see the sign that said 'Look Out for the Cars'; I was not looking for the sign that said 'Look Out for the Cars.' * * * "When I got to this crossing I went about 25 feet the other side. I then stopped my car. Why I stopped is because when I turned to my left to get over that crossing, instead of me hitting the crossing straight, there is a kinder of a turn to the right, and I turned to my left, and when I hit that track, my rear tire skidded; the rail was about four inches out of the ground. There is a grade on each side of the track. It is a little hill. When you drive an automobile and hit the grade, the tendency is not to stop. It will stop just to a certain extent. I had slackened up and was watching him then. I was putting the gas to it and getting across. As soon as I got the car across I stopped. I stopped between that sign and the track. About the time I stopped this other car passed me. I was about 25 feet from the track at that time. I will say that this car passed me going 25 miles per hour, but I don't know; I don't know if there was anything to keep them from seeing the train or not. I could see it after I crossed over. When I stopped I could see it. There was nothing to keep me from seeing it when I stopped. With reference to whether there was anything to keep them from seeing it when they got close to me, I would say, maybe they had their attention on me. There was nothing to obstruct their view. I don't know if they could have seen it way down the track, there is plenty of high grass there. Any one looking to the right could see it coming. After they passed me going 25 miles per hour and got on the track, that is not when I heard the crash; I heard the squeaking of the brakes; this fellow must have been trying to stop. It was not the brakes on the train; it was the brakes on the car. He got the front wheels over, and the rear wheels were on the track. The train struck the rear wheels of the car. The rear wheels were between the rails. I guess he thought he was going to make it, and when he saw it was too late he put the juice to it; I don't know about that.

"All of these parties were riding on the front seat. All four of them. How I came to recognize how they were sitting in the car, there was a girl that I thought I recognized. The boy was sitting behind the wheel, and there was a girl sitting next to him, and the other girl was sitting next to her jammed up, and the other one was sitting slanting; none of her body was on the door, but was sideways, she was not sitting on the door, but the largest part of her was leaning towards the back of the car. I don't think she was sitting in the lap of the other girl, she may have had one leg on her; I don't know for sure. When I saw them go by they had the appearance of laughing or talking; they were smiling; I don't know if they were talking. I don't know if they had the appearance of laughing as if they were having a good time one with the other. If they were laughing I don't know if they were enjoying themselves. I am laughing now, but I am not enjoying myself. These young ladies and this young man when they passed me did not impress me seriously; they were driving along as young people usually do, that is the way it appeared to me; that is the impression made on me."

It will be noted that this witness testifies to no fact that would overcome the legal presumption of want of negligence on the part even of the driver of this automobile, let alone that as to his invited guests, but if he had, or if there were otherwise sufficient evidence to sustain a finding of negligence on the driver's part, that would not preclude the girls, because being merely his invited guests for the pleasure ride with him, his negligence would not be imputable to them. 2 R. C. L. p. 1207, par. 43. His suggestion that, as he saw them go by, at about 25 feet from the railroad track, they "had the appearance of laughing or talking, they were smiling, I don't know if they were talking," is not inconsistent with the exercise of due care upon their part, because he had just said, in denying that the crash of the collision upon the railroad track was the first thing he heard, "I heard the squeaking of the brakes; this fellow must have been trying to stop. It was not the brakes of the train; it was the brakes of the car"—which occurrence therefore, being before the crash of the collision, reasonably must have been about when or very little after the automobile passed him. This statement at least tends to negative any inference of negligence from his other one about the nonserious appearance to him of these young people as they passed by him, as well as any from the mere happening of the accident, because it positively indicates that at or about that very moment some one or more of them had seen the train, and that the young driver had thrown on his brakes in the effort to stop his car; for aught, too, that appears from his testimony as a whole, or for that matter from anything else in this record, that one may have been this girl, who was found by

the jury to have been culpably oblivious of the approach of the train. On the other hand, there being nothing in the record to the contrary, this girl may have been the one who was sitting sideways in the automobile, and perhaps in a position from which she was unable to see the train during the very brief interval of its visibility to those situated so they could look in its direction.

At all events, the indulgence of any one of these guesses as to what actually transpired —and such they all plainly are rather than legitimate evidentiary inferences from any proven fact—is, as appellants contend, as reasonable and permissible from the slim group of inconclusive circumstances before the jury on the issue of contributory negligence as any other; that being true, the proof received on the question failed to meet the requirement correctly laid down in the court's charge.

Because the evidence was insufficient to support the finding on which the judgment was based, there must be a reversal and a remanding of the cause for another trial. That order has accordingly been entered.

Reversed and remanded.